**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW HAMPSHIRE**

Torrence Holt Becker, Plaintiff,

v.

New Hampshire Division for Children, Youth and Families (DCYF);

New Hampshire Department of Health and Human Services (DHHS);

[Supervisor] Catrina Horne, in her individual and official capacities;

[Supervisor] Jessica Surgento, in her individual and official capacities;

CPSW Kimberley McKenney, in her individual and official capacities;

Dr. William Brehm, in his individual and official capacity as DHHS Ombudsman;

John/Jane Does 1-10, in their individual and official capacities, Defendants.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

**Jury Trial Demanded**

NOW COMES the Plaintiff, Torrence Holt Becker, pro se, and respectfully submits this Verified Complaint against the above-named Defendants, and in support thereof states as follows:

**PRELIMINARY STATEMENT**

1. This civil rights action challenges the systematic violation of constitutional rights and state law by the New Hampshire Division for Children, Youth and Families (DCYF) in its child protective investigations. The Defendants have engaged in a pattern of conduct spanning multiple years that violates clearly established constitutional rights, including:

   a. Fourth Amendment rights against unreasonable searches and seizures;

   b. Fourteenth Amendment procedural and substantive due process rights;

   c. First Amendment rights to familial association;

   d. State statutory protections under NH RSA 169-C.

2. This pattern of constitutional violations is not isolated but represents a systematic practice spanning from 2019 to present. Through documented findings of "reasonable concern" in multiple assessments, DCYF has repeatedly acknowledged having probable cause while simultaneously refusing to follow statutory requirements for obtaining court orders. This deliberate circumvention of constitutional protections has created a shadow system of family regulation operating outside legal constraints.

3. This action seeks declaratory and injunctive relief to reform DCYF's unconstitutional practices, compensatory damages for violations of constitutional rights, and enhanced compensatory damages under state law for wanton, malicious, or oppressive violations.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy. Additionally, this Court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (4), as this action seeks redress for the deprivation of rights secured by the Constitution

of the United States and seeks equitable relief under
federal civil rights laws.

5. Venue is proper in the District of New Hampshire pursuant
to 28 U.S.C. § 1391(b) because:
(1) all defendants reside in New Hampshire;
(2) a substantial part of the events giving rise to these
claims occurred in this district; and (3) all defendants
are residents of New Hampshire in which this district is
located. Additionally, the acts and practices complained of
occurred in Manchester, New Hampshire, within the
jurisdiction of this Court.

**PARTIES**

6. Plaintiff Torrence Holt Becker is a resident of Manchester,
New Hampshire.

7. Defendant New Hampshire Division for Children, Youth and
Families is a state agency within the Department of Health
and Human Services, with it's main office located at 129
Pleasant Street, Concord, NH, 03301.

8. Defendant New Hampshire Department of Health and Human
Services is a state agency located at 129 Pleasant Street,
Concord, NH 03301.

9. Defendant Supervisor Catrina Horne, in her individual and
official capacities, address unknown;

10. Defendant Supervisor Jessica Surgento, in her individual
and official capacities, residing at 18 Darby Ln, Bedford
NH 03110;

11. Defendant CPSW Kimberley McKenney, in her individual and
official capacities, residing at 7 Hills End Way Manchester
NH 03104;

12. Defendant Dr. William Brehm, in his official capacity as
DHHS Ombudsman,unknown address;

13. Defendants John and Jane Doe 1-10

**FACTUAL ALLEGATIONS**

**A. Historical Pattern of Statutory Violations (2019-2024)**

14. Between 2019 and 2023, DCYF engaged in a systematic
pattern of deliberately circumventing statutory

requirements for home entry during child protective assessments:

a. During this period, DCYF conducted multiple assessments of Plaintiff's family;

b. In each assessment, Plaintiff explicitly exercised his constitutional and statutory right to refuse DCYF entry to his home;

c. Despite these refusals, DCYF never sought a court order to enter the premises as required by RSA 169-C:34, VII;

d. Instead, upon reason and belief, DCYF closed each assessment as "Unfounded but with Reasonable Concern";

e. Under RSA 169-C:3, XXIX, a finding of "reasonable concern" explicitly requires DCYF to have established probable cause.

15. This pattern demonstrates a calculated strategy to avoid statutory compliance while simultaneously documenting probable cause through official findings:

a. By closing assessments as "with reasonable concern," DCYF officially documented having probable cause in each case;

b. Despite having documented probable cause, DCYF systematically failed to follow the statutory requirement to obtain entry orders;

c. This created a circular pattern where DCYF:

    i. Documented probable cause through official findings

    ii. Failed to use that probable cause to obtain legally required entry orders

    iii. Repeated the pattern with each new assessment

16. This historical pattern continued through the October 2024 assessment, during which:

## B. October 2024 Constitutional Violations

## Initial Contact

17. On October 4, 2024 around 3:30 pm, CPSW Kimberley McKenney met with the Plaintiff and his children at Pine Island Park in Manchester NH for a first parent contact meeting.

4

18.  Plaintiff clearly stated he would be video recording the meeting. CPSW McKenney did not record the meeting, instead referencing her notebook on how she gets her cues.

19.  Supervisor Surgento would later mention CPSW McKenney's failure to record when Plaintiff is recording is against DCYF procedure.

20.  CPSW McKenney began by addressing Plaintiff's rights regarding home entry, affirming that DCYF was "not obligated" to enter and that Plaintiff had a right to deny entry, while expressing she was "truly concerned" about potential maintenance issues.

21.  Plaintiff stated he was open to a home visit but requested the presence of a neutral third party, such as an attorney, due to several incidents of intense trauma inflicted on his family by DCYF. CPSW McKenney acknowledged his right to have an attorney present but emphasized her goal of addressing safety concerns.

22.  Plaintiff suggested alternative methods to verify home conditions while maintaining his constitutional rights. Despite these good-faith efforts at cooperation, DCYF deliberately chose to circumvent statutory requirements through coercion and other methods.

23.  Within the first four minutes of this initial meeting, Plaintiff informed CPSW McKenney that his child was sick with a fever, establishing DCYF's early knowledge of the child's medical vulnerability. This information would become critically relevant to DCYF's subsequent decisions to place the child in dangerous conditions.

24.  The meeting ended without a resolution, with CPSW McKenney stating that she would discuss the matter with her supervisor, 'maybe in the next hour she can think of something'.

**Coercive Separation and Constitutional Violations**

25.  On the morning of October 7, 2024, the Plaintiff's children's mother gained unauthorized entry to Plaintiff's residence while experiencing what appeared to be a manic episode, during which she took photographs of temporary plumbing repairs in progress and the contained mold situation previously disclosed to DCYF.

5

26.  At 8:58 AM, at the request of his minor child, Plaintiff
     texted CPSW McKenney requesting assistance with this
     situation. Instead of providing support, at 9:14 AM, CPSW
     McKenney responded by declaring the apartment
     'uninhabitable', demanding 'the children need to be placed
     at grandparents homes immediately and not return until this
     is fixed and deemed fit' and that if Plaintiff continues to
     'keep children at this apartment I will consult with our
     legal team for removal' based solely on the mother's
     unauthorized entry and photographs, without independent
     verification of conditions.

27.  October 7, 2024 at 1:01 pm, CPSW McKenney presented
     Plaintiff by email with a safety plan containing inaccurate
     descriptions of home conditions. The plan mandated that
     Plaintiff's children remain at their grandparents'
     residence until DCYF could "approve" Plaintiff's home for
     the children's return.

28.  When Plaintiff requested correction of the factual
     inaccuracies in the safety plan, Supervisor Horne replied
     to the email, explicitly threatening removal of his
     children unless he signed the plan as written. This
     ultimatum created an unconstitutional framework wherein:

     a. DCYF claimed authority to prevent the children's return
     home without having obtained any court order authorizing
     such separation;
     b. DCYF conditioned family reunification on their future
     approval of Plaintiff's home, while lacking legal authority
     to conduct such inspection or impose such conditions;
     c. DCYF attempted to create extra-judicial authority over
     both family separation and home inspection, circumventing
     both the warrant requirements of the Fourth Amendment and
     the due process requirements for child removal;
     d. DCYF leveraged the threat of an immediate removal to
     compel Plaintiff's acceptance of indefinite separation,
     bypassing all constitutional protections designed to
     prevent unauthorized state interference with family
     integrity.

29.  This scheme constituted a deliberate attempt to exercise
     authority that DCYF had not legally obtained through proper
     judicial channels, effectively creating a shadow system of

family regulation outside the constitutional framework of the Fourth Amendment's warrant requirement and the Fourteenth Amendment's due process protections.

30.   The constitutional violations were compounded by DCYF's subsequent actions in:

a. Maintaining this extra-judicial separation without seeking court authorization;

b. Continuing to demand home inspection authority without obtaining a warrant;

c. Imposing conditions on family reunification without legal authority to do so;

d. Using the threat of formal removal proceedings to maintain compliance with these unauthorized mandates.

**Deliberate Stonewalling**

31. Upon reason and belief between October 7 and October 11, 2024, DCYF engaged in a calculated pattern of non-response to approximately 15 documented communication attempts during multiple dangerous crises they had created, including:

October 7, 2024:

- 3:54 PM: Voicemail to CPSW McKenney
- 3:55 PM: Voicemail to Supervisor Horne
- 4:05 PM: Call to Supervisor Horne (no answer)
- 4:16 PM: Emergency email regarding no placement options
- 4:55 PM: Follow-up emergency email stating "We are on the streets"
- 4:56 PM: Additional call to CPSW McKenney
- 4:57 PM: Additional call to Supervisor Horne
- 5:16 PM: Call to Concord District Office seeking emergency assistance
- 5:26 PM: Follow-up call to Concord District Office
- 6:06 PM: Unanswered Email to DHHS Ombudsman titled: Formal Complaint Regarding DCYF Coercion and Inaccuracies in Safety Plan
- 7:39 PM: Emergency call to Central Intake

October 8, 2024:

- 12:01 PM: Call to Concord District Office
- 12:08 PM: Unanswered Email to DHHS Ombudsman titled: Repeated Violations of NH RSA 169-C:34, VII by DCYF
- 1:42 PM: Call to Supervisor Horne
- 3:07 PM: Additional call to Supervisor Horne
- 3:22 PM, 3:28 PM, 4:24 PM, and 4:46 PM: Multiple calls to Manchester District Office

32. This deliberate stonewalling occurred despite Plaintiff's repeated pleas for assistance regarding the homelessness crisis DCYF had created.

**Forced Unsafe Conditions**

33. Due to the stonewalling, on October 7, 2024, Plaintiff went to Manchester City Welfare to express concerns about the alternative housing situation City Welfare and DCYF had arranged.

34. Plaintiff specifically identified the danger of placing his child in a transphobic environment at grandparents home.

35. Manchester City Welfare dismissed these concerns stating the housing arrangements were implemented by DCYF and they could not provide alternative emergency housing.

36. These concerns were validated within 36 hours when on October 9, an explosive argument about trans issues occurred at 5:30 AM at the maternal Grandparents' home where DCYF had mandated the trans child stay.

**First Emergency Night Shift Intervention**

37. At 7:30 PM on October 7, 2024, Plaintiff contacted the emergency intake number listed on the unsigned safety plan and spoke with Supervisor Melissa Vermette.

38. Plaintiff explained the homelessness situation the Division's stonewalling had placed his children in.

39. Sup Vermette requested Plaintiff take time stamped photographs of the conditions of the home.

40. After reviewing time-stamped photographs of home conditions, Supervisor Vermette approved the home for one night's occupancy.

41. Supervisor Vermette explicitly stated that her criteria
    for determining safety differed from the day shift's
    mission of examining total home conditions.
42. Supervisor Vermette assured Plaintiff that Supervisor
    Horne would contact him the following morning (October 8)
    to develop a new safety plan.
43. No such contact occurred, demonstrating a pattern of
    broken promises and deliberate non-communication.
44. No new safety plan would ever be attempted.
45. On October 8 2024, with no resolution to the safety plan,
    Plaintiff and his transgender child slept at paternal
    Grandfathers warehouse office, avoiding the explosive
    argument at the location DCYF mandated the child stay.
    Unfortunately not all children avoided the argument.

**De Facto Removal**

46. Between October 7-14, 2024, Defendants effectuated a de
    facto removal of Plaintiff's children through multiple
    coordinated actions:
    a. Forcing separation through coercive safety plans;
    b. Mandating placement in unsafe environments;
    c. Potentially exposing children to transphobic harassment;
    d. Forcing children to camp in dangerous weather conditions
    while ill;
    e. Removing children from Plaintiff's DHHS food assistance
    benefits on October 11, 2024, without notice or
    explanation;
    f. All without providing any due process protections
    required for removal.
47. This de facto removal was confirmed through multiple
    official actions:
    a. Supervisor Surgento's recorded acknowledgment on October
    11, 2024, that the children "were removed from my care";
    b. DHHS's administrative removal of the children from
    Plaintiff's household for benefits purposes on October 11,
    2024;
    c. The concealment of this benefits change until
    Plaintiff's discovery of reduced benefits on November 5,
    2024.
48. On October 11, 2024, around 8:30 AM, Supervisor Surgento
    finally contacted Plaintiff on a recorded phone call.

49. During this call, Supervisor Surgento:
   a. Confirmed this was a de facto removal, acknowledging the
   children had been removed from Plaintiff's home and care
   b. Claimed there was no coercion because Plaintiff did not
   sign the safety plan, ignoring the impact of their threats
   c. Insisted on maintaining the safety plan's requirements
   despite documented safety concerns
   d. Informed Plaintiff that the mother will be taking the
   children camping due to lack of emergency housing available
   through Manchester City Welfare.
50. Plaintiff attempted to discuss his concerns of the
   camping arrangement with Manchester City Welfare Heather on
   October 10 2024 around 9:30 am.
51. He explained he was bringing these concerns to her
   because DCYF had refused meaningful communication for over
   60 hours and 1 previous homelessness crises already that
   week.
52. Heather dismissed Plaintiff, explicitly stating all child
   concerns must be reported to DCYF caseworker.
53. Heather signed and dated a document stating she "refuses
   to listen to child safety concerns".

**Second Emergency Intervention for Child Safety**

54. The camping arrangement exposed the children to:
   a. Temperatures as low as 37°F
   b. Rain
   c. Dangerous weather conditions while sick with Upper
   Respiratory Infections
   d. Lack of proper camping equipment, which DCYF failed to
   verify or ensure was available
   e. Unnecessary mental distress during DCYF overnight home
   visit, as evidenced by police body cam footage
55. On October 12, 2024, Plaintiff again contacted the DCYF
   emergency intake line and spoke with Supervisor Vermette.
56. Plaintiff again explained the dangerous situation the
   Division had approved for his children.
57. Supervisor Vermette expressed clear concern about the
   situation DCYF had orchestrated.
58. Supervisor Vermette offered to allow the child to return
   home only if Plaintiff agreed to:
   a. Allow an overnight CPSW entry

    b. Permit police presence during the entry
    c. Submit to a limited safety check rather than a full home inspection

59. **Plaintiff agreed to these conditions under duress, solely to protect his children from further trauma.**

60. Around 10:00 pm Supervisor Vermette then instructed Plaintiff to remove all other children from the dangerous camping situation or face police intervention.

61. CPSW Kyla(?) arrived around 11:30 pm to perform the home inspection. She informed Plaintiff she has to wait until police show up so the children must wait in the car as they are not allowed in the home yet.

62. Manchester Police arrive around 12:30 am. They wait briefly for CPSW Kyla to re-arrive after a bathroom break.

63. Around 12:45 am October 13 2024, CPSW Kyla and 3 Manchester police officers observed conditions in the home. After observing for 5 minutes Plaintiff informs CPSW Kyla the children have now been waiting in the car for nearly 3 hours in the middle of the night. CPSW Kyla approves the home

64. Throughout the remainder of the home visit, attended by CPSW Kyla, Supervisor Vermette (via phone), three police officers, and one sergeant, the children were left entirely exposed to the severe emotional trauma caused by their mother's breakdown. This incident stemmed from the removal of the children from the campsite, which had been previously deemed appropriate by DCYF day shift and Manchester City Welfare. Despite the presence of eight adults, including CPSW Kyla and law enforcement personnel, the Plaintiff was the only individual who checked on the children's well-being during the mother's prolonged, nearly hour-long emotional episode.

65. After approving the home through CPSW Kyla and the police, Supervisor Vermette explained this approval, like the last one, was temporary for 48 hours. She promised contact by DCYF day shift on Monday morning to create a viable safety plan.

**Continued Pattern of Violations**

66. On October 14, 2024, Supervisor Surgento contacted Plaintiff. She advised DCYF would delay any further action until CPSW McKenney returned from vacation.

67. Multiple weeks passed without resolution, during which the Office of the Child Advocate expressed ongoing confusion about:
a. The status of any safety plan
b. Why the children were permitted to stay at Plaintiff's home without DCYF verifying total home conditions
c. The legal basis for DCYF's actions

68. The coordinated nature of these constitutional violations is evidenced by a documented pattern of behavior, including:
a. Initial refusal to record the October 4 meeting despite DCYF procedure requiring it
b. Written email threats regarding child removal if Plaintiff refused to sign an admittedly inaccurate safety plan
c. Supervisor Surgento's recorded statement on October 11, 2024, dismissing procedural requirements by stating 'It's not like they're laws'
d. Administrative removal of children from Plaintiff's DHHS benefits on October 11, 2024, without notice or due process

**Unauthorized Home Entry and Interview of a Minor Child**

69. On October 29, 2024, CPSW McKenney, without prior notice or parental consent:
a. Entered Plaintiff's private residential building through the first-floor entrance
b. Proceeded up the private stairwell to Plaintiff's third-floor apartment
c. Initiated contact with Plaintiff's minor disabled son
d. Conducted an unauthorized interview of Plaintiff's son while Plaintiff was absent
e. Failed to make any attempt to contact Plaintiff before interviewing son

70. During this unauthorized interview, CPSW McKenney:
a. Questioned Plaintiff's son about Plaintiff's whereabouts and expected return time
b. Inquired about Plaintiff's sons presence at home during school hours

c. Asked about his health status and wellbeing

d. Questioned him if maintenance had been by to complete repairs in the home

e. Made specific inquiries about the heating situation

f. Observed and documented Plaintiff's son's physical appearance and demeanor

71.  This unauthorized interview caused immediate and documentable harm to Plaintiff's son, including:

a. Heightened anxiety, as evidenced by his atypical behavior of locking the door after CPSW McKenney's departure

b. Emotional distress, manifested through providing repeated "I don't know" responses despite having direct knowledge of the matters being questioned

c. Observable changes in demeanor noted by Plaintiff upon return home

72.  CPSW McKenney subsequently:

a. Failed to promptly inform Plaintiff about the interview with his minor child

b. Initially avoided directly answering Plaintiff's questions about whether the interview was recorded

c. Attempted to minimize the interaction by characterizing it as not being a "formal interview"

d. Used information obtained during this unauthorized interview to further the Division's investigation

73.  These actions violated multiple statutory and constitutional provisions:

a. NH RSA 169-C:34:VII which requires DCYF to seek an order to enter a child's home if the parent refuses entry and the division has probable cause to believe abuse or neglect has occured

b. Fourth Amendment protections against warrantless entry into private residences

c. Fourteenth Amendment due process rights regarding parental authority over minor children

d. NH Constitution Part I, Article 19 protecting against unreasonable searches

e. Division policies regarding documentation and recording of child interviews

74.  The DHHS Ombudsman's subsequent responses compounded these violations:

a. DHHS Ombudsman Dr. Will's written acknowledgment that no recording was required because "a child's home is not a 'public place'" demonstrates:

    i. A fundamental misunderstanding of constitutional protections

    ii. An official policy or practice of conducting warrantless entries and interviews in private homes

    iii. Deliberate indifference to constitutional rights

75. The Division's actions demonstrate a pattern of:

a. Conducting unauthorized interviews with minor children

b. Entering private residences without warrant or consent

c. Using information obtained through unauthorized means to further investigations

d. Failing to properly document interactions with minor children

e. Attempting to minimize or obscure violations of policy and law

**Final Attempted Violation**

76. On November 7 2024, Before closing the October assessment, DCYF made one final attempt to circumvent RSA 169-C:34, VII and the 4th Amendment by:

a. Coordinating with City Welfare to force a building code inspection at Plaintiff's apartment, (edit this maybe another count?)

b. Attempting to use the landlord's presence at the building code inspection to gain unauthorized entry

c. Being refused entry by the landlord, who stated they should obtain a warrant

**C. Individual Defendants' Knowing Violations of Constitutional Rights**

77. CPSW McKenney knew or should have known that entering a private residence without consent or a warrant violated clearly established constitutional rights, as evidenced by:

    a. Plaintiff's explicit notification during the October 4, 2024 recorded meeting regarding legal requirements for home entry [Exhibit A]

    b. The clearly marked private entrance with mail slot she bypassed on October 28, 2024

      c. Her decision to conduct an unauthorized interview within the constitutionally protected space of the home

      d. Her subsequent attempts to use information gathered during this unconstitutional entry

78. Supervisor Horne deliberately violated clearly established constitutional rights when she:

      a. Presented a safety plan containing known factual inaccuracies on October 7, 2024

      b. Explicitly threatened child removal unless Plaintiff signed the inaccurate plan

      c. Maintained family separation without seeking court authorization despite having no emergency circumstances

      d. Deliberately ignored documented attempts at communication during the crisis she created

      e. Continued to demand warrantless home inspection authority despite being informed of the constitutional requirements

79. Supervisor Surgento knowingly perpetuated constitutional violations when she:

      a. Acknowledged on a recorded October 11, 2024 call that this was a removal while providing no due process

      b. Stated 'It's not like they're laws' when confronted about procedural violations

      c. Maintained the separation despite documented safety concerns about the placement

      d. Required children to remain in dangerous conditions despite having evidence of a safe alternative

      e. Failed to seek court authorization for continued separation despite knowing one was required"

## D. Systemic Failures of Administrative Oversight

80. Beginning October 7, 2024, Plaintiff initiated a series of formal complaints to the DHHS Ombudsman's Office documenting serious violations by DCYF. The Ombudsman's handling of these complaints demonstrates systematic failures in administrative oversight:

**Initial Emergency Complaints**

81.  On October 7, 2024, Plaintiff submitted his first formal
complaint to the Ombudsman regarding DCYF's coercive
tactics. Despite the urgent nature of this complaint and
multiple follow-up attempts, the Ombudsman's Office
provided no response.

82.  On October 8, 2024, Plaintiff submitted a second formal
complaint specifically addressing DCYF's failure to adhere
to RSA 169-C:34, VII. This complaint also received no
response despite multiple follow-up attempts.

## Delayed and Inadequate Responses

83.  On November 6, 2024, Plaintiff submitted a third
complaint regarding the delay, denial, and noncommunication
in attempts, to access records necessary to document DCYF's
violations of RSA 169-C:34, VII.

84.  On November 7, 2024, Dr. Will of the Ombudsman's Office
responded with only a request for clarification about the
statutory citation, demonstrating a failure to maintain
proper records of previous complaints or acknowledge the
ongoing nature of the issues.

85.  On November 8, 2024, Dr. Will issued a response that:
a. Fundamentally mischaracterized the nature of Plaintiff's
complaints
b. Failed to address the substance of DCYF's statutory
violations
c. Provided a legally incorrect interpretation that
attempted to justify constitutional violations
d. Acknowledged in writing that CPSW McKenney conducted an
interview within "the child's home," thereby admitting to
an unauthorized entry of a constitutionally protected space

86.  When Plaintiff provided a detailed response explaining
the Ombudsman's misunderstanding and requesting attention
to numerous unaddressed complaints, the Ombudsman's Office
provided no reply.

## Final Dismissal of Oversight Responsibilities

87.  On November 20, 2024, after Plaintiff inquired by email
about the status of his numerous unanswered complaints, Dr.
Will responded by:
a. Claiming to have conducted an "internal legal review"

while providing no documentation or explanation of its findings
b. Dismissing Plaintiff's valid legal interpretations without addressing the clear language of the statute
c. Incorrectly stating that assessments were closed as merely "Unfounded" when they were actually closed as "Unfounded With Reasonable Concern," a critical distinction under RSA 169-C:3, XXIX that requires probable cause
d. Declaring a refusal to "engage further in the matter" despite numerous unaddressed serious complaints
e. Announcing a preemptive refusal to respond to future communications unless deemed a "new issue" by their office
f. Acting on that refusal when Plaintiff asked for clarity
88.  The Ombudsman's handling of these complaints demonstrates:
a. Deliberate indifference to family safety concerns
b. Failure to maintain proper records of submitted complaints
c. Unwillingness to address documented statutory violations
d. Misapplication of legal standards to justify DCYF misconduct
e. Abandonment of oversight responsibilities
f. Creation of a circular logic whereby probable cause sufficient to close a case as "with reasonable concern" was simultaneously deemed insufficient to trigger statutory requirements for obtaining entry orders
89.  This pattern of oversight failure directly contributed to:
a. Continued violations of constitutional rights
b. Ongoing failures to follow statutory requirements
c. Perpetuation of dangerous conditions for families
d. Lack of accountability for DCYF misconduct
e. Denial of meaningful administrative remedies for affected families

## Historical Context

90.  On or around February 5, 2024, the New Hampshire Division for Children, Youth, and Families (DCYF) applied for a Manchester Family Division court order to enter the Plaintiff's residence based on allegations it had received. This application brought RSA 169-C:34, VII to the

Plaintiff's attention for the first time. The court granted the order, and it was executed on February 6, 2024.

91.  On February 8, 2024, the Plaintiff filed an objection to the court order, arguing that DCYF had failed to comply with the procedural requirements outlined in RSA 169-C:34, VII. The Plaintiff's objection also included a request for legal representation pursuant to RSA 169-C:10, II(a).

92.  Contained in the February objection to Manchester Family Division court, Plaintiff noted he feared for the health, safety, and well being of his family any time DCYF involved itself in his family relations, an ominous foreshadowing of the October incident.

93.  DCYF subsequently moved to dismiss the Plaintiff's objection, asserting that the matter was moot since the order had already been executed.

94.  On February 9 2024, while awaiting the court's rulings, a DCYF Child Protective Services Worker (CPSW), Matt Dixon, demanded access to the Plaintiff's residence on February 12, 2024, citing the already-executed February 6 court order. Despite Plaintiff's request for these demands to be documented via email, no written documentation was provided. [See: Gmail correspondence titled "Refusal of Receipt"].

95.  On or around 2/14/24, the family division judge granted DCYF's motion to dismiss based on mootness.

96.  On February 20, 2024, New Hampshire House Leader Sherm Packard announced the formation of a bipartisan special legislative committee on DCYF, charged with considering all matters on due process and practices concerning DCYF.

97.  DCYF's October 2024 violations represent a continuation of systematic Fourth Amendment violations dating to 2019. By repeatedly documenting probable cause through "reasonable concern" findings while refusing to obtain required entry orders, DCYF demonstrated:
a. Deliberate circumvention of warrant requirements;
b. Official policy of attempting warrantless entry despite known legal obligations;
c. Pattern of using coercive tactics when constitutional compliance was refused;
d. Systematic violation of clearly established law regarding administrative searches.

**Evidence Catalog and Discovery Plan**

**I. Key Documentary Evidence Referenced in Complaint**

**A. October 2024 Constitutional Violations**

1. Video Recording of Initial Parent Contact Meeting (October 4, 2024)
   - Referenced in ¶18
   - Documents explicit notification to CPSW McKenney regarding statutory requirements
   - Demonstrates knowledge of legal obligations
2. Safety Plan Documentation (October 7, 2024)
   - Referenced in ¶27-28
   - Contains demonstrably false information about home conditions
   - Shows coercive tactics through explicit threats of removal
   - Critical evidence for procedural due process claims
3. Emergency Communications Log (October 7-11, 2024)
   - Referenced in ¶31
   - Documents approximately 15 attempted communications including:
     - Email records
     - Phone logs
     - District office contact attempts
   - Demonstrates deliberate indifference through systematic non-response
4. Recorded Phone Call with Supervisor Surgento (October 11, 2024)
   - Referenced in ¶47(a)-48
   - Contains explicit acknowledgment of de facto removal
   - Documents statement "It's not like they're laws"
   - Critical evidence of deliberate constitutional violations
5. DHHS Benefits Records (October-November 2024)
   - Referenced in ¶47(b)

- Shows administrative removal of children without notice
- Documents timing of benefits termination
- Supports procedural due process claims

6. Police Body Camera Footage (October 12, 2024)
- Referenced in ¶54(e)
- Documents children's trauma during overnight visit
- Shows conditions of mandatory oversight

## B. Historical Pattern Evidence

7. Previous Assessment Records (2019-2023)
- Referenced in ¶14-15
- Documents pattern of "Unfounded but with Reasonable Concern" findings
- Shows systematic avoidance of court orders despite probable cause
- Critical for establishing municipal liability

8. February 2024 Court Records
- Referenced in ¶85-89
- Contains prior objection to DCYF practices
- Documents early notice of constitutional concerns
- Shows pattern of conduct

## C. Administrative Oversight Evidence

9. Ombudsman Correspondence (October-November 2024)
- Referenced in ¶80-89
- Multiple formal complaints documenting violations
- Written responses attempting to justify unconstitutional practices
- Critical for supervisory liability claims

## II. Additional Evidence to be Obtained Through Discovery

## A. DCYF Internal Documents

1. Written Policies and Procedures
- Investigation protocols
- Home entry requirements

- Safety plan procedures
- Recording requirements for child interviews
- Emergency response protocols
- Documentation standards for "reasonable concern" findings

2. Training Materials
   - Constitutional rights training
   - Warrant requirement procedures
   - Safety plan protocols
   - Emergency removal standards
   - Documentation requirements

3. Internal Communications
   - Emails regarding October 2024 incident
   - Communications about prior assessments
   - Discussions of warrant requirements
   - Safety plan implementation guidance
   - Regarding the creation of House special committee on DCYF with a focus on due process violations

4. Personnel Records
   - Training records for named defendants
   - Performance evaluations
   - Disciplinary records related to constitutional violations
   - Documentation of knowledge regarding legal requirements

## B. **Statistical and Pattern Evidence**

1. Assessment Data (2019-2024)
   - Number of assessments closed as "with reasonable concern"
   - Records of court orders sought vs. assessments conducted
   - Documentation of warrant applications
   - Statistics on safety plan implementation

2. Complaint Records
   - Prior constitutional violations
   - Pattern of procedural violations
   - Documentation of response protocols

- Documentation of response protocols
- Resolution tracking

3. Audit Records
  - Internal reviews of assessment procedures
  - Compliance monitoring reports
  - Quality control documentation
  - Performance metrics

## C. Individual Case Documentation

1. Complete Case File
   - All notes and records from October 2024 assessment
   - Documentation of probable cause determinations
   - Communications regarding placement decisions
   - Records of safety condition evaluations

2. Electronic Communications
   - Emails between defendants regarding case
   - Internal discussions of constitutional requirements
   - Documentation of decision-making process
   - Records of emergency response protocols

3. Supervisory Records
   - Documentation of oversight decisions
   - Reviews of constitutional compliance
   - Records of response to complaints
   - Evidence of policy implementation

## D. Third-Party Records

1. Manchester City Welfare
   - Documentation of housing arrangements
   - Communications with DCYF
   - Records of safety concerns
   - Evidence of coordination

2. Police Department
   - Complete body camera footage
   - Incident reports
   - Communications with DCYF
   - Documentation of oversight role

3. Medical Records

- Documentation of children's upper respiratory infections
- Records of exposure-related treatment
- Evidence of health impact from conditions
- Treatment recommendations

## III. **Methods for Authentication and Citation**

1. All documents will be cataloged and authenticated following applicable evidence rules, ensuring preservation of metadata and maintaining a clear chain of custody.

## IV. **Key Areas for Expert Testimony**

1. Child Welfare Standards
   - Constitutional requirements in investigations
   - Industry standard practices
   - Risk assessment protocols
   - Documentation requirements
2. Psychological Impact
   - Trauma from family separation
   - Effects on disabled child
   - Long-term developmental implications
   - Treatment recommendations
3. Administrative Practices
   - Standard operating procedures
   - Documentation requirements
   - Training protocols
   - Oversight mechanisms
4. Constitutional Law
   - Fourth Amendment requirements
   - Due process standards
   - Family integrity rights
   - Administrative search requirements

## CAUSES OF ACTION

**COUNT I – Violation of Fourth Amendment Rights (42 U.S.C. § 1983)**

98.  Plaintiff incorporates by reference all preceding paragraphs.

99.  The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, requiring probable cause and a warrant except in specifically established exceptions.

100. In October 2024, Defendants violated Plaintiff's Fourth Amendment rights through:
     a. CPSW McKenney's unauthorized entry into Plaintiff's private entrance without consent or warrant;
     b. Conducting an unauthorized interview with Plaintiff's child within the constitutionally protected space of their home;
     c. Attempting to circumvent warrant requirements by seeking entry through a landlord during a code inspection;
     d. Using coercive tactics, including threats of child removal, to attempt to gain warrantless entry.

101. The DHHS Ombudsman's Office explicitly acknowledged these constitutional violations in writing when stating that no recording was required for the October 28 interview because "a child's home is not a 'public place,'" thereby admitting to conducting an unauthorized investigation within a constitutionally protected space.

102. The First Circuit has clearly established that administrative searches of homes require either consent or a warrant. The only exceptions are exigent circumstances or emergency conditions, neither of which were present here. See Fletcher v. Town of Clinton, 196 F.3d 41, 47 (1st Cir. 1999).

103. Defendant McKenney directly violated this clearly established law by entering Plaintiff's private entrance without consent or warrant on October 28, 2024. Defendant Horne  attempted to coerce consent through threats of child removal, which the First Circuit has held cannot constitute valid consent. See Pagán-González v. Moreno, 919 F.3d 582, 591-92 (1st Cir. 2019).

104. The procedural due process violations in October 2024
followed DCYF's established pattern from 2019-2023 of:
a. Documenting probable cause through "reasonable concern"
findings;
b. Failing to initiate proper legal proceedings despite
having probable cause;
c. Creating extra-judicial methods to circumvent due
process requirements;
d. Using administrative findings to maintain authority
without judicial oversight.

105. This constitutional violation was particularly egregious
given that Plaintiff's son is a disabled minor child
requiring additional protections and safeguards. CPSW
McKenney conducted this unauthorized entry despite
maintenance personnel being present in the home,
demonstrating no exigent circumstances existed to justify
warrantless entry. During this unauthorized entry, McKenney
conducted an investigative interview by questioning
Plaintiff's son about his health status, school attendance,
home heating situation, and whether maintenance had
performed improvements – information later used to further
the Division's investigation. The constitutional injury is
evidenced by Plaintiff's son's immediate manifestation of
anxiety and atypical behavior, including the unprecedented
action of locking the door after McKenney's departure, and
answering "I dont know" to whether the maintenance had
performed work while maintenance was there performing work,
demonstrating the actual harm caused by this unauthorized
government intrusion.

**COUNT II - Violation of Procedural Due Process (42 U.S.C. §
1983)**

106. Plaintiff incorporates by reference all preceding
paragraphs.

107. The Fourteenth Amendment requires that state actors
provide adequate notice and opportunity to be heard before
depriving individuals of protected liberty interests,
including the right to family integrity.

108. Defendants violated Plaintiff's procedural due process
rights by:

25

   a. Effectuating a de facto removal of Plaintiff's children in October 2024 without proper hearings or procedures;

   b. Refusing to correct demonstrably false information in the safety plan that formed the basis for family separation;

   c. Deliberately stonewalling communication for five days during the crises they created, preventing any opportunity to challenge their actions;

   d. Failing to provide proper documentation or recordings of investigative actions as required by state law.

109. Supervisor Surgento explicitly confirmed the procedural due process violations on October 11, 2024, when she acknowledged and confirmed on a recorded call that the children "were removed from my care",

110. On the same phone call Supervisor Surgento advised Plaintiff, "It's not like they are laws" when confronted about DCYF failures to follow procedures.

111. Parents have a fundamental liberty interest in the care, custody, and management of their children that cannot be deprived without due process. See Santosky v. Kramer, 455 U.S. 745, 753 (1982); Suboh v. District Attorney's Office, 298 F.3d 81, 91 (1st Cir. 2002).

112. Defendant Horne violated this right by presenting a coercive safety plan containing known false information on October 7, 2024, effectively removing Plaintiff's children without any hearing or opportunity to challenge the allegations. Defendant Surgento perpetuated this violation on October 11, 2024, when she acknowledged the de facto removal while refusing to provide any process for challenging the separation.

113. The Division's procedural failures were compounded by CPSW McKenney's subsequent attempts to minimize the constitutional violation by characterizing the interview as merely 'informal,' while simultaneously using information gathered during this unauthorized interaction to further the investigation. When questioned about recording requirements, the Division engaged in a pattern of evasion, initially avoiding direct answers about whether the interview was recorded.

**COUNT III – Violation of Substantive Due Process (42 U.S.C. § 1983)**

114. Plaintiff incorporates by reference all preceding paragraphs.

115. The Fourteenth Amendment protects fundamental liberty interests, including family integrity and the right to be free from arbitrary government action.

116. Defendants violated these rights through conduct that shocks the conscience, including:

a. Presenting Plaintiff with a "Hobson's choice" between signing a knowingly false safety plan or having his children removed;

b. Deliberately forcing children to stay in a known transphobic environment despite documented safety concerns;

c. Requiring sick children to camp in dangerous weather conditions as low as 37°F with rain while suffering from upper respiratory infections;

d. Maintaining these dangerous conditions despite having photographic evidence that Plaintiff's home was safe for the children.

117. These actions demonstrate deliberate indifference to family safety and well-being, as evidenced by:

a. Ignoring at least 15 calls and emails seeking assistance during the crisis;

b. Refusing to respond to emergency communications through multiple channels including district offices, after-hours services, and oversight bodies;

c. Maintaining dangerous placement requirements even after confirming safety concerns.

118. State officials violate substantive due process when their conduct 'shocks the conscience' through deliberate indifference to fundamental rights. See County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998); DePoutot v. Raffaelly, 424 F.3d 112, 118-19 (1st Cir. 2005).

119. Defendant Horne demonstrated deliberate indifference by forcing children to stay in a known transphobic environment despite documented safety concerns. Defendant Surgento's decision to maintain this dangerous placement while ignoring multiple emergency communications shocks the conscience, as defined in DePoutot.

27

**COUNT IV - First Amendment Right to Familial Association (42 U.S.C. § 1983)**

120. Plaintiff incorporates by reference all preceding paragraphs.

121. The First Amendment protects the fundamental right of family association and integrity.

122. Defendants violated this right by:

a. Using coercive tactics to separate Plaintiff's family without legitimate justification;

b. Maintaining forced separation even after safety concerns were documented;

c. Creating and prolonging a homelessness crisis that unnecessarily separated the family;

d. Refusing to facilitate communication or reunification despite having no legitimate safety concerns.

123. The First Amendment protects family relationships and association from unjustified government interference. See Roberts v. U.S. Jaycees, 468 U.S. 609, 618-20 (1984); Suboh, 298 F.3d at 91.

124. Defendants Horne and Surgento violated this clearly established right by maintaining family separation through coercion and threats, without any legitimate child protection justification as required under Suboh.

**COUNT V - Violation of NH RSA 169-C:34, VII**

125. Plaintiff incorporates by reference all preceding paragraphs.

126. NH RSA 169-C:34, VII requires DCYF to obtain a court order based on probable cause before entering a home when entry is refused.

127. RSA 169-C:34, VII represents a legislative codification of constitutional protections, requiring probable cause and court authorization before home entry. The statute's plain language demonstrates legislative intent to create mandatory procedures, not discretionary guidelines. See Appeal of Town of Nottingham, 153 N.H. 539, 545 (2006) (discussing statutory interpretation principles).

128. Defendants repeatedly violated this statute by:
    a. Failing to seek an order to enter premises despite claiming to have probable cause of abuse or neglect.;
    b. Attempting to circumvent the statute in October 2024 through coercive safety plans;
    c. Attempting to gain unauthorized entry through third parties;
    d. Conducting warrantless investigations within Plaintiff's home.
129. These violations demonstrate a pattern of willfully disregarding statutory requirements designed to protect constitutional rights.

## COUNT VI - State Constitutional Violations

130. Plaintiff incorporates by reference all preceding paragraphs.
131. The New Hampshire Constitution provides broader protection for individual rights than its federal counterpart. See State v. Ball, 124 N.H. 226, 231-32 (1983). Article 19 of the New Hampshire Constitution specifically protects against unreasonable searches, while Part I, Article 2 safeguards the natural rights of families. The New Hampshire Supreme Court has held that these protections exceed federal standards, particularly in the context of administrative searches. See State v. Settle, 122 N.H. 214, 217-18 (1982).
132. Defendants violated these enhanced protections when they:
    a. Conducted warrantless administrative searches of Plaintiff's home;
    b. Employed coercive tactics to circumvent state constitutional protections;
    c. Interfered with family integrity without meeting the heightened standards required under the state constitution.
133. The New Hampshire Supreme Court has specifically held that child protective workers must obtain judicial authorization before entering private homes absent consent or emergency circumstances. See In re Tracy M., 137 N.H. 119, 125-26 (1993)."

## COUNT VII - Negligent Training and Supervision

134. Plaintiff incorporates by reference all preceding paragraphs.

135. Under New Hampshire law, state agencies have a duty to properly train and supervise employees regarding statutory requirements and constitutional rights. See Marquay v. Eno, 139 N.H. 708, 716-17 (1995).

136. Defendants breached this duty by:

 a. Failing to train employees on proper warrant requirements;

 b. Allowing supervisors to use coercive tactics to circumvent constitutional protections;

 c. Failing to maintain proper oversight of investigation procedures;

 d. Permitting systematic violations of state law

137. The DHHS Ombudsman's fundamentally incorrect interpretation of statutory requirements, as evidenced by their response regarding 169-C:34:VII, demonstrates systematic failures in training and oversight.

138. The Division's systematic training failures are evidenced by documented confusion among staff regarding basic constitutional requirements for child interviews. CPSW McKenney's conduct demonstrates a fundamental lack of training regarding proper procedures for interviewing disabled minors without parental consent or court authorization. This training deficit extends to basic documentation requirements, as demonstrated by McKenney's failure to record or properly document her interview with a disabled minor child. The Division's subsequent attempts to justify these failures through artificial distinctions between 'formal' and 'informal' interviews demonstrates a systematic failure to properly train staff on constitutional and statutory requirements.

**COUNT VIII - Enhanced Compensatory Damages**

139. Plaintiff incorporates by reference all preceding paragraphs.

140. Under New Hampshire law, enhanced compensatory damages are available when defendants act with wanton, malicious, or oppressive disregard for plaintiff's rights. See Figlioli v. R.J. Moreau Cos., 151 N.H. 618, 621 (2005).

141. Defendants' actions were wanton, malicious, and
oppressive, as demonstrated by:
  a. Refusing to edit false information in safety plans;
  b. Knowingly placing children in dangerous conditions;
  c. Intentionally stonewalling communication during family
  crises;
  d. Willfully maintaining family separation without
  legitimate justification;
  e. Systematically failing to acknowledge or address
  documented violations.
142. These actions demonstrate the type of calculated
indifference to rights that New Hampshire courts have held
warrants enhanced damages. See Keshishian v. CMC
Radiologists, 142 N.H. 168, 182 (1997).

## COUNT IX - Municipal Liability (42 U.S.C. § 1983 - Monell)

143. Plaintiff incorporates by reference all preceding
paragraphs.
144. DCYF and DHHS, acting under color of state law through
their officials, employees, and agents, maintained
policies, practices, and customs that directly caused the
deprivation of Plaintiff's constitutional rights.
145. DCYF and DHHS maintained policies, practices, and customs
that directly caused constitutional violations, as
evidenced by:
  a. Systematic practice from 2019-2024 of documenting
  probable cause while avoiding court oversight, in violation
  of *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986);
  b. Official policy of closing cases as "with reasonable
  concern" while refusing to seek entry orders, which
  reflects a pattern of official policy that could amount to
  deliberate indifference under *City of Canton v. Harris*, 489
  U.S. 378, 389 (1989);
  c. Established pattern of using coercive tactics to
  circumvent statutory requirements, which violates due
  process rights and can support liability based on a pattern
  of constitutional violations as seen in *Connick v.
  Thompson*, 563 U.S. 51, 61 (2011);
  d. Deliberate creation of extra-judicial systems to
  maintain authority without court orders, which constitutes

an unconstitutional custom that deprives individuals of
their rights and directly parallels the principles of
municipal liability set forth in *Pembaur*, 475 U.S. at 480.

## COUNT X - Supervisory Liability for Constitutional Violations (42 U.S.C. § 1983)

146. Plaintiff incorporates by reference all preceding
paragraphs.

147. The Supreme Court has established that supervisory
officials may be held liable under § 1983 when their
conduct demonstrates deliberate indifference to
constitutional violations. See Farmer v. Brennan, 511 U.S.
825, 837 (1994). This liability extends to officials who
create or perpetuate unconstitutional policies or
practices. See Pembaur v. City of Cincinnati, 475 U.S. 469,
483-84 (1986).

148. Defendant Dr. William Brehm, in his role as DHHS
Ombudsman, demonstrated deliberate indifference to
constitutional violations through a documented pattern of
conduct:

a. Creation and Documentation of Unconstitutional Policies

- On November 8, 2024, Dr. Brehm issued a written
  response explicitly justifying warrantless entry into
  private homes and unauthorized interviews with
  children

- In the same November 8 response, Dr. Brehm created a
  written policy attempting to circumvent constitutional
  protections by claiming "a child's home is not a
  'public place'" while simultaneously acknowledging
  entry occurred

- On November 20, 2024, Dr. Brehm referenced an
  "internal legal review" while refusing to provide any
  documentation, demonstrating the creation of opaque
  oversight procedures designed to justify
  constitutional violations

b. Direct Participation in Constitutional Violations

- In his November 8, 2024 response, Dr. Brehm explicitly
  acknowledged and attempted to justify CPSW McKenney's

unauthorized entry and interview within "the child's home"

- When confronted with evidence that this entry violated constitutional rights, Dr. Brehm responded on November 20, 2024, by refusing to "engage further in the matter," demonstrating conscious disregard for ongoing violations
- Dr. Brehm's November 8 response created and documented policies attempting to distinguish between "public" and private spaces in a manner that systematically violated Fourth Amendment protections

c. Documented Pattern of Non-Response to Constitutional Violations

- On October 7, 2024, Plaintiff submitted an emergency complaint regarding coercive tactics and resulting homelessness. Dr. Brehm provided no response despite multiple follow-ups
- On October 8, 2024, Plaintiff submitted a formal complaint regarding statutory violations affecting constitutional rights. Again, Dr. Brehm provided no response despite follow-ups
- This pattern of non-response continued until November 6, 2024, when Plaintiff submitted a third complaint, demonstrating systematic disregard for ongoing constitutional violations

**COUNT XI - Administrative Due Process Violations (42 U.S.C. § 1983)**

149. Plaintiff incorporates by reference all preceding paragraphs.
150. The Fourteenth Amendment requires that administrative oversight mechanisms provide meaningful opportunities to challenge constitutional violations. See Mathews v. Eldridge, 424 U.S. 319, 333 (1976).
151. Defendant Dr. Brehm violated these clearly established rights through documented actions:
   a. Systematic Denial of Emergency Administrative Remedies

- Failed to respond to October 7, 2024 emergency complaint regarding coerced family separation, resulting in child homelessness
- Ignored October 8, 2024 complaint about ongoing statutory violations affecting constitutional rights
- Maintained silence despite multiple follow-up attempts regarding emergency situations
- On November 20, 2024, explicitly declared refusal to "engage further in the matter" despite unaddressed emergency complaints

b. Creation of Demonstrably Inadequate Oversight Procedures

- On November 20, 2024, cited an "internal legal review" while refusing to provide:
  - Documentation of review procedures
  - Explanation of legal analysis
  - Opportunity to challenge findings
- Created circular logic regarding probable cause, as evidenced by November 20 response claiming assessments were merely "Unfounded" when documentation shows they were actually closed as "Unfounded With Reasonable Concern," a designation requiring probable cause under RSA 169-C:3, XXIX
- Established policies preventing meaningful review by declaring on November 20, 2024, that the office "will not be responding further to your calls or emails unless you raise a new issue"

c. Documented Obstruction of Administrative Relief

- On November 8, 2024, deliberately mischaracterized Plaintiff's complaints by focusing narrowly on one incident while ignoring documented pattern of violations
- When Plaintiff provided detailed correction explaining the broader pattern of violations, Dr. Brehm provided no response
- On November 20, 2024, preemptively refused to consider future complaints without reviewing existing unaddressed violations

**COUNT XII - Policy-Based Constitutional Violations (42 U.S.C. § 1983)**

152. Plaintiff incorporates by reference all preceding paragraphs.

153. Under Monell v. Department of Social Services, 436 U.S. 658 (1978), officials who create unconstitutional policies may be held liable for resulting constitutional violations.

154. Defendant Dr. Brehm created and documented unconstitutional administrative policies through written communications:

a. Establishment of Written Unconstitutional Policies

- November 8, 2024 response creating written policy attempting to justify warrantless entry into private homes
- Same response establishing policy distinguishing between "public" and private spaces in manner violating Fourth Amendment
- November 20, 2024 response documenting policy of refusing oversight based on internal, undocumented reviews

b. Creation of Systematic Barriers to Constitutional Protection

- Documented in November 8, 2024 response:
  - Policy attempting to justify unrecorded interviews within constitutionally protected spaces
  - Framework for circumventing warrant requirements through semantic distinctions
  - System for avoiding documentation of investigative actions
- Confirmed in November 20, 2024 response:
  - Policy of conducting undocumented internal reviews
  - System of preemptively refusing future complaints
  - Framework for avoiding accountability through circular probable cause logic

c. Implementation of Policies Preventing Effective Oversight Through written responses, Dr. Brehm established policies that:

- Justified constitutional violations through misinterpretation of statutory requirements
- Created artificial distinctions to avoid constitutional protections
- Established circular logic regarding probable cause that prevented meaningful review
- Implemented systems for avoiding documentation of violations
- Created barriers to administrative remedy through preemptive refusal of complaints

155. The implementation and maintenance of these policies demonstrated deliberate indifference to constitutional rights, as evidenced by:

- Written acknowledgment of warrantless entry while maintaining policies enabling such entry
- Documented refusal to provide transparency regarding internal review procedures
- Creation of systems explicitly designed to prevent future oversight
- Written policies attempting to justify constitutional violations through semantic distinctions
- Establishment of circular logic regarding probable cause that systematically prevented meaningful review

## Inapplicability of Qualified Immunity

156. The doctrine of qualified immunity does not shield Defendants from liability because their actions violated clearly established constitutional rights that any reasonable official would have known were protected.

## Clear Establishment of Constitutional Rights

157. By October 2024, multiple binding precedents had clearly established the constitutional rights Defendants violated: a. Warrantless Home Entry - The Supreme Court established in Camara v. Municipal Court, 387 U.S. 523 (1967) that

administrative searches of homes require warrants -
b. Coerced Consent - The First Circuit explicitly held in
Pagán-González v. Moreno, 919 F.3d 582, 591-92 (1st Cir.
2019) that consent obtained through deceptive practices or
coercion is not valid - Multiple circuits have established
that threatening adverse action to obtain consent renders
that consent invalid. See, e.g., *Bumper v. North Carolina*,
391 U.S. 543 (1968)
c. Family Separation - The Supreme Court clearly
established in Santosky v. Kramer, 455 U.S. 745 (1982) that
parents have a fundamental liberty interest in the care and
custody of their children - The First Circuit specifically
held in Suboh v. District Attorney's Office, 298 F.3d 81
(1st Cir. 2002) that emergency removal requires immediate
danger to the child

158. These rights were not merely established in abstract
terms but through specific holdings directly applicable to
child protective investigations:
a. The First Circuit's decision in Camara explicitly
addressed warrant requirements for administrative
investigators
b. In re Tracy M. specifically bound DCYF to obtain court
orders for home entry
c. Suboh directly addressed the standards for emergency
removal by child protective workers Obvious Nature of
Violations

159. Defendants' violations were so obvious that any
reasonable official would have known their conduct was
unconstitutional:
a. CPSW McKenney conducted a warrantless entry after: -
Being explicitly informed of the warrant requirement -
Receiving direct citation to controlling statute [Exhibit
A] - Having probable cause documented through "reasonable
concern" findings - Being denied consent for entry
b. Supervisor Horne attempted coerced consent through: -
Explicit threats of child removal - Presentation of
knowingly false safety plans - Demands for warrantless
entry - Maintenance of extra-judicial family separation
c. Supervisor Surgento perpetuated obvious violations by: -
Acknowledging an unauthorized removal had occurred -
Dismissing procedural requirements as "not laws" -

Maintaining family separation without court authorization -
Forcing children into dangerous conditions Statutory
Framework

160. 155. The constitutional violations were particularly
obvious given New Hampshire's explicit statutory framework:
a. RSA 169-C:34, VII codifies the warrant requirement for
home entry
b. RSA 169-C:3, XXIX defines "reasonable concern" as
requiring probable cause
c. This statutory scheme provided clear notice that: -
Warrants were required for non-consensual entry - Probable
cause must be brought before a court - Extra-judicial
family separation was prohibited Direct Knowledge of
Violations

161. Defendants demonstrated actual knowledge of the
unconstitutional nature of their conduct:
a. CPSW McKenney's attempts to minimize her warrantless
entry by calling it "informal"
b. Supervisor Horne's deliberate stonewalling when
confronted about violations
c. Supervisor Surgento's recorded dismissal of procedural
requirements
d. Dr. Brehm's written attempts to justify unconstitutional
practices

162. This actual knowledge removes any possible claim of
reasonable mistake or confusion about legal requirements.

163. Given this combination of:
- Clearly established law
- Obvious violations
- Explicit statutory requirements
- Direct knowledge of unconstitutionality

Qualified immunity cannot shield Defendants from liability
for their deliberate violations of clearly established
constitutional rights.

## REQUEST FOR APPOINTMENT OF COUNSEL

164. Plaintiff respectfully moves this Court to appoint
counsel pursuant to 28 U.S.C. § 1915(e)(1), which provides
that "the court may request an attorney to represent any
person unable to afford counsel."

165. The Supreme Court has established that appointment of counsel in civil cases requires evaluation of:
   a. The merits and complexity of the case
   b. The plaintiff's ability to present the case
   c. The likelihood that appointment of counsel would make a difference in the outcome See Mathews v. Eldridge, 424 U.S. 319, 335 (1976).
166. This case presents exceptional circumstances warranting appointment of counsel:

Complexity of Legal Issues
a. Multiple intersecting constitutional claims requiring sophisticated legal analysis
b. Complex procedural requirements for establishing municipal liability
c. Intricate interplay between federal civil rights law and state child protection statutes
d. Need for extensive discovery and expert testimony
e. Complicated injunctive relief requirements

Public Interest Considerations
a. Case involves systemic constitutional violations affecting numerous families
b. Outcome could significantly impact child protection practices statewide
c. Issues parallel those being investigated by special legislative committee
d. Resolution requires careful balancing of child protection and constitutional rights

Plaintiff's Circumstances
a. Documented indigency and inability to afford private counsel
b. Exhaustive good-faith efforts to secure representation through multiple channels
c. Statutory right to counsel in underlying child protection matters (RSA 169-C:10,II(a))
d. Direct impact of case outcome on fundamental parental rights

167. Appointment of counsel would substantially aid the Court by:
   a. Ensuring efficient presentation of complex constitutional claims

b. Facilitating proper discovery and evidence preservation
c. Assisting in development of appropriate injunctive relief
d. Protecting both individual and public interests at stake
168. Plaintiff has demonstrated his commitment to pursuing these claims through:
a. Thorough documentation of constitutional violations
b. Extensive research of applicable legal standards
c. Good-faith compliance with procedural requirements
d. Diligent efforts to secure private counsel

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court:

A. A. Appoint counsel to assist Plaintiff in the prosecution of these significant constitutional claims under 28 U.S.C. § 1915(e)(1);

B. Issue declaratory relief finding that:

1. Defendants' practice of conducting warrantless home entries and investigations violates the Fourth Amendment and Article 19 of the New Hampshire Constitution;
2. Defendants' use of coercive safety plans to effectuate de facto removals without court orders violates the Fourteenth Amendment's procedural due process requirements;
3. Defendants' practice of maintaining family separation without court authorization violates the First Amendment right to familial association;

4. Defendants' systematic failure to follow RSA 169-C:34,
   VII's requirements for obtaining entry orders violates both
   statutory and constitutional rights;

5. Defendants' administrative oversight mechanisms, as
   implemented, fail to provide constitutionally adequate
   procedural protections.

6. DCYF's practice of documenting probable cause through
   "reasonable concern" findings while failing to seek court
   orders violates both statutory requirements and
   constitutional protections;

7. The systematic nature of these violations from 2019-2024
   demonstrates deliberate indifference requiring enhanced
   oversight and structural reform.

C. Issue preliminary and permanent injunctive relief requiring
Defendants to:

1. Implement specific written policies and procedures
   requiring:
   a. Documentation of probable cause determinations before
   seeking home entry;
   b. Court authorization prior to any non-emergency removal
   or family separation;
   c. Recording of all investigative interviews as required by
   state law and dcyf procedure;
   d. Written acknowledgment of constitutional rights provided
   to families at first contact;
   e. Mandatory court filing within 48 hours whenever an
   assessment is closed "with reasonable concern";

f. Written justification for any failure to seek court orders when probable cause is documented;

g. Regular audits of all assessments closed "with reasonable concern" to ensure proper legal procedures were followed;

h. Creation of oversight mechanisms to prevent systematic circumvention of statutory requirements.

2. Establish mandatory training programs covering:

a. Constitutional requirements for home entry and investigation;

b. Proper documentation of safety concerns and probable cause;

c. Legal standards for emergency removal versus court-ordered separation;

d. Proper handling of safety plans and voluntary arrangements;

3. Create oversight mechanisms including:

a. Regular audits of investigation procedures and documentation;

b. Independent review of all safety plans and removals;

c. Transparent complaint investigation procedures with defined timelines;

d. Regular reporting to the Court on compliance metrics;

4. Cease immediately:

a. Using threats of removal to coerce consent for home entry;

b. Maintaining family separation without court authorization;

c. Conducting warrantless entries and investigations;

    d. Stonewalling emergency communications from affected
families.

D. Award compensatory damages against individual Defendants in
their individual capacities for:

  1. Direct Constitutional Violations:
    a. Fourth Amendment violations arising from unauthorized
home entry and warrantless investigation, including
intrusion upon seclusion and violation of reasonable
expectations of privacy;
    b. First Amendment violations of familial association,
including interference with parent-child relationships and
forced separation without due process;
    c. Fourteenth Amendment procedural due process violations,
including deprivation of parental rights without hearing or
meaningful opportunity to challenge;
    d. Fourteenth Amendment substantive due process violations
from conduct shocking the conscience, including deliberate
exposure of children to dangerous conditions;
    e. State constitutional violations under Part I, Articles 2
and 19 of the New Hampshire Constitution.
  2. Consequential Economic Damages:
    a. Lost wages and diminished earning capacity resulting
from responding to manufactured crises;
    b. Emergency housing expenses necessitated by coerced
displacement;
    c. Medical expenses for treatment of children's upper
respiratory infections exacerbated by exposure to dangerous

camping conditions;

d. Future therapeutic and counseling services necessary to address trauma from:

    i. Forced family separation

    ii. Exposure to transphobic harassment

    iii. Homelessness and dangerous living conditions

    iv. Unauthorized governmental intrusion

e. Legal expenses incurred attempting to protect constitutional rights;

f. Loss of government benefits wrongfully terminated without notice or hearing;

g. Transportation costs associated with maintaining family contact during forced separation.

3. Non-Economic Damages:

a. Severe emotional distress and mental anguish from:

    i. Coerced separation from children

    ii. Knowledge of children's exposure to dangerous conditions

    iii. Inability to protect children from harm due to governmental interference

    iv. Helplessness during periods of deliberate non-communication

b. Loss of familial association and bonding opportunities during critical developmental periods;

c. Damage to family stability and parent-child relationships;

d. Loss of privacy and dignity from unauthorized governmental intrusion;

e. Reputational harm within the community;

      f. Loss of enjoyment of life and ordinary family activities;

      g. Physical and emotional manifestations of stress;

      h. Anxiety and fear regarding future governmental intervention.

4. Special Damages for Child with Disabilities:

      a. Additional trauma from unauthorized interview conducted without accommodations;

      b. Heightened anxiety and behavioral changes documented after governmental intrusion;

      c. Disruption of established routines critical for stability;

      d. Increased therapeutic needs resulting from trauma;

      e. Future impacts on educational and developmental progress.

E. Award enhanced compensatory damages against individual Defendants under New Hampshire law, justified by:

1. Deliberate Indifference to Constitutional Rights:

      a. Conscious decision to maintain family separation despite documented safety risks

      b. Willful refusal to meaningfully respond to 15+ emergency communications over five days

      c. Explicit acknowledgment of constitutional violations through recorded statements

      d. Systematic attempts to obscure violations through misleading documentation

2. Calculated Infliction of Emotional Distress:

    a. Presenting knowingly false safety plans under threat of
    child removal

    b. Forcing placement in known transphobic environment
    despite warnings

    c. Maintaining dangerous camping conditions for sick
    children

    d. Deliberately stonewalling communications during
    manufactured crises

3. Pattern of Oppressive Conduct:

    a. Using administrative authority to create extra-judicial
    family regulation

    b. Leveraging threats of child removal to coerce compliance

    c. Creating artificial barriers to constitutional remedies

    d. Systematically circumventing statutory protections

4. Malicious Abuse of Authority:

    a. Conducting unauthorized entry after explicit notice of
    legal requirements

    b. Removing children from benefits without notice or
    hearing

    c. Manufacturing homelessness through coordinated agency
    action

    d. Attempting to use code enforcement to circumvent warrant
    requirements

F. Award pre-judgment and post-judgment interest on all damages
as allowed by law.

G. Award reasonable attorney fees and costs pursuant to 42
U.S.C. § 1988, including:

1. Costs of suit and expert witness fees;
2. Reasonable attorney fees for any future representation;
3. Costs associated with monitoring compliance with injunctive
   relief.

H. Retain jurisdiction to ensure compliance with the Court's
orders.

I. Grant such other relief as this Court deems just and proper.

**VERIFICATION**

I, Torrence Holt Becker, the Plaintiff in this matter, verify
under penalty of perjury that the foregoing is true and correct
to the best of my knowledge, information, and belief.

Executed on this 27 day of December , 2024

Respectfully submitted,

x _____

Torrence Holt Becker,
Plaintiff, Pro Se
162 Willow St, Manchester NH, 03103
ThisIsTory@gmail.com
707-986-8679